**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **KENNETH LEWIS,**<br>**individually, and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FPL FOOD, LLC,**<br><br>**Defendant.** | ) | Case No. |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Kenneth Lewis ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant FPL Food, LLC ("FPL" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is "the Southeast's leading family-owned producer of fresh beef staffing provider headquartered in Augusta, Georgia."[1]

[1] https://fplfood.com/ (last visited August 18, 2024).

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach")

4. It is unknown precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems— thereby allowing cybercriminals unrestricted access to employees' PII.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiff is a Data Breach victim, having received a Breach Notice. A copy of the client's Breach Notice is attached as Exhibit A and a sample Breach Notice is attached as Exhibit B. He brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, Plaintiff's and the Class's private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8. Plaintiff, Kenneth Lewis, is natural person and citizen of Georgia. He resides in Augusta, Georgia where he intends to remain.

9. Defendant, FPL Food, LLC is a Foreign Limited Liability Company with its principal place of business at 1301 New Savannah Rd., Augusta, Georgia 30901.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11. This Court has general personal jurisdiction over Defendant FPL because Defendant's principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

12. Venue is proper under 18 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District.

## BACKGROUND

***Defendant Collected and Stored the PII of Plaintiff and the Class***

13. Defendant is an Augusta-based beef producer founded in 2004. Defendant employs over 1,600 team members and operates facilities and farms in Georgia and Texas.[2]

14. In collecting and maintaining the PII of its employees, Defendant impliedly agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

15. As part of its business, Defendant receives and maintains the PII of thousands of employees. In doing so, Defendant implicitly promises to safeguard their PII.

---

[2] https://fplfood.com/about-us/history/ (last visited August 18, 2024).

16. Under state and federal law, businesses like Defendant have duties to protect its current and former employees' PII and to notify them about breaches.

17. Defendant recognizes these duties. For one, Defendant declares—in its Privacy Policy— that it "respects the privacy of the visitors to our digital properties and the users of our products and services" and it is "committed to protecting" that privacy.[3]

18. Similarly, Defendant states that it:

a. "follow[s] generally accepted standards designed to help protect the personal information submitted to us, both during transmission and once it is received;" and

b. "maintain[s] our services and all associated information with technical, administrative, and physical safeguards to help protect against the loss, unauthorized access, destruction, misuse, modification and improper disclosure of your personal information."[4]

***Defendant's Data Breach***

19. Due to the obfuscating nature of Defendant's Breach Notice, it is unclear when the Data Breach began, however on information and belief, the Data Breach occurred prior to May 30, 2024.[5]

20. The total number of individuals injured by the Data Breach is unclear, but upon information and belief, the impacted individuals include current and former employees of Defendant.

21. Because of Defendant's Data Breach, at least the following types of PII were

---

[3] https://fplfood.com/privacy-policy/ (last visited August 18, 2024).
[4] *Id.*
[5] https://ransomwareattacks.halcyon.ai/attacks/fpl-food-llc-targeted-by-play-ransomware-group (last visited August 18, 2024).

compromised:

a. Names,

b. Addresses,

c. Social Security numbers, and

d. Employee benefits information. Ex. A.

22. And yet, Defendant waited until July 3, 2024 before it mailing notifications to the Class. Ex. A.

23. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

24. And when Defendant did notify Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class to spend time and money to prevent further harm:

a. "activate the identity monitoring services we are providing;"

b. "review the 'Additional Important Information' section included with this letter;"

c. "closely monitor your personal accounts for any suspicious activity." Ex. B.

25. Defendant failed in its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

26. Since the breach, Defendant has implemented "increased security measures" and

conducted "additional employee training." Ex. A. But this is too little too late. Simply put, these measures—which Defendant now recognizes as necessary—should have been implemented *before* the Data Breach.

27. On information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

28. Further, the Notice of Data Breach shows that Defendant cannot—or will not—determine the full scope of the Data Breach, as Defendant has been unable to determine precisely when the breach occurred, how long it lasted, and how many individuals were impacted. *See* Ex. A.

29. Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Defendant inflicted upon them.

30. Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

***Notorious Cybercriminal Group "Play" Now Has the PII of Plaintiff and the Class***

31. Since the Data Breach occurred, a notorious cybercriminal group called "Play" has claimed responsibility.[6]

32. Thus far, Play has:

a. claimed to have accessed and stolen data from Defendant— including highly sensitive PII;

[6] https://x.com/Comparitech/status/1811801623032676739 (last visited August 18, 2024).

b. and has threatened to *publish the data* if a ransom is not paid.[7]




33. Play's post indicates that the sensitive data that they exfiltrated includes "private and personal confidential information, client documents, budget details, payroll information, accounting records, contracts, taxes, IDs, and financial data."[8]

34. In the days leading up to the publication of the stolen data, Play's post indicated that it had been viewed over 900 times.[9]

35. Further, Play threatened to publish the stolen data if the ransom was not paid by June 4, 2024.[10]

36. Thus, upon information and belief, Plaintiff and the Class' information has already been published on the dark web.

---

[7] *Id.*
[8] https://ransomwareattacks.halcyon.ai/attacks/fpl-food-llc-targeted-by-play-ransomware-group (last visited August 18, 2024).
[9] https://www.hookphish.com/blog/ransomware-play-group-hits-fpl-food/ (last visited August 18, 2024).
[10] *Id.*

| | |
|---|---|
| Victim Name | FPL Food |
| Victim Website *(if available)* | www[.]fplfood[.]com |
| Victim Country | United States |
| Date Added | 2024-05-30 |
| Publication Date(of files) | 2024-06-04 |
| Dark Web Post Views | 946 |
| Publication Status | 2 DAYS BEFORE PUBLICATION |

37. Play is a particularly sophisticated and dangerous criminal group, having "evolved from data theft to using ransomware tactics."[11]

38. Play has been profiled by the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA).[12] In a joint advisory, these federal agencies issued the following warnings about Play:

a. "Since June 2022, the Play (also known as Playcrypt) ransomware group has impacted a wide range of businesses and critical infrastructure in North America, South America, and Europe;"

b. "As of October 2023, the FBI was aware of approximately 300 affected entities allegedly exploited by [Play];"

c. "Play ransomware group is presumed to be a closed group, designed to 'guarantee the secrecy of deals,' according to a statement on the group's

[11] https://ransomwareattacks.halcyon.ai/attacks/fpl-food-llc-targeted-by-play-ransomware-group (last visited August 18, 2024).
[12] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-352a (last visited August 18, 2024).

data leak website;"

d. "Play ransomware actors employ a double-extortion model, encrypting systems after exfiltrating data. Ransom notes do not include an initial ransom demand or payment instructions, rather, victims are instructed to contact the threat actors via email."[13]

***Plaintiff's Experiences and Injuries***

39. Plaintiff Kenneth Lewis is a former employee of Defendant.

40. As a condition of employment, Defendant required Plaintiff to provide it with his PII. Defendant thus obtained and maintained Plaintiff's PII.

41. Plaintiff provided his PII to Defendant and trusted that the company would use reasonable measures to protect it according to FPL's internal policies as well as state and federal law.

42. As a result, Plaintiff was injured by Defendant's Data Breach.

43. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

44. Plaintiff received a Notice of Data Breach on August 14, 2024.

45. Through its Data Breach, Defendant compromised Plaintiff's:

a. Name;

b. Social Security number;

c. Address; and

d. Employee benefits information.

46. On information and belief, Plaintiff's PII was obtained by Play and has been, or

[13] *Id.*

will be, published on the dark web.

47. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice. *See* Ex. B.

48. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

49. Indeed, following the Data Breach, Plaintiff has experienced numerous instances of fraud in the form of fraudulent charges of $129.65 for new services on his Dish account in Augst 2024 and an unauthorized payment of $103.50 made to the account on August 9, 2024 using his credit card information.

50. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

51. Plaintiff suffered actual injury from the exposure and theft of his PII— which violates his rights to privacy.

52. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

53. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

54. Because of the Data Breach, Plaintiff anticipates spending considerable amounts

of time and money to try and mitigate his injuries.

55. Today, Plaintiff has a continuing interest in ensuring that his PII— which, upon information and belief, remains backed up in Defendant's possession— is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

56. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

57. Stolen PII is one of the most valuable commodities on the criminal information

black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

58. The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"— further exposing the information.

59. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

60. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross- referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

61. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

62. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber- criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

63. Defendant disclosed the PII of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed

the PII of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

64. Defendant's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

65. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

66. According to the *2023 Annual Data Breach Report*, the number of data compromises in 2023 nearly doubled compared to 2022.[14] And in 2023, a record 3,205 breaches occurred, exposing the data of approximately 353,027,892 victims.[15]

67. Indeed, cyberattacks have become so notorious in the Agriculture sector that the Food and Agriculture-Information Sharing and Analysis Center (Food and Ag-ISAC) released its first annual report, stating that the industry was the *seventh* most targeted sector in the country.[16]

68. And, Play, the same ransomware group responsible for the attack on FPL, "has taken over as the most prolific gang, claiming responsibility for five attacks on the agriculture

[14] https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited August 18, 2024).
[15] *Id.*
[16] https://therecord.media/food-and-agriculture-hit-with-ransomware-attacks (last visited August 18, 2024).

sector thus far."[17]

69. According to the USDA, "[h]ackers and cyber attackers are targeting agribusinesses due to the value and wealth the sector holds. The nature and abundance of agricultural data, including information ranging from crop cultivation and harvest schedules to financial records, makes agribusinesses targets for ransom demands."[18]

70. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

71. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

72. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[19] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

[17] *Id.*
[18] https://www.ams.usda.gov/about-ams/giac-may-2024-meeting/cybersecurity (last visited August 18, 2024).
[19] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

73. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

74. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

75. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure— to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

76. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

77. Several best practices have been identified that—at a *minimum*— should be implemented by businesses like Defendant. These industry standards include: educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

78. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

79. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

80. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

81. Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

82. The nationwide Class that Plaintiff seeks to represent is defined as follows:

> All United States residents whose PII was compromised in the Data Breach experienced by FPL in May 2024, including all

those who received notice of the breach.

83. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

84. Plaintiff reserves the right to amend the class definition.

85. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

86. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

87. Numerosity. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least thousands of members.

88. Typicality. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

89. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. his interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

90. Commonality and Predominance. Plaintiff's and the Class's claims

raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

91. Superiority. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their

injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Class)**

92. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

93. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

94. Defendant owed a duty of care to Plaintiff and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

95. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

96. Defendant owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class members' PII.

97. Defendant owed—to Plaintiff and Class members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

98. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

99. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

100. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

101. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential

PII, a necessary part of obtaining employment from Defendant.

102. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant held vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII—whether by malware or otherwise.

103. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

104. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

105. Defendant breached these duties as evidenced by the Data Breach.

106. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

107. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

108. Defendant further breached its duties by failing to provide reasonably timely

notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

109. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

110. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

111. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

112. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

113. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

114. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class members' sensitive PII.

115. Defendant breached its respective duties to Plaintiff and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

116. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

117. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

118. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class members would not have been injured.

119. The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known

that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

120. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

121. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

122. Plaintiff and Class members were required to provide their PII to Defendant as a condition of receiving employment from Defendant. Plaintiff and Class members provided their PII to Defendant in exchange for Defendant's employment.

123. Plaintiff and Class members reasonably understood that a portion of the funds generated by their employment would be used to pay for adequate cybersecurity measures.

124. Plaintiff and Class members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

125. Plaintiff and the Class members accepted Defendant's offers by disclosing their PII to Defendant in exchange for employment.

126. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

127. In its Privacy Policy, Defendant represented that it had a legal duty to protect Plaintiff's and Class Member's PII.

128. Implicit in the parties' agreement was that Defendant would provide Plaintiff

and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

129. After all, Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

130. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

131. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

132. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

133. Defendant materially breached the contracts it entered with Plaintiff and Class members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

134. In these and other ways, Defendant violated its duty of good faith and fair dealing.

135. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

136. Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

137. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

138. Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

139. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

140. Because of the highly sensitive nature of the PII, Plaintiff and Class members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had

they known the reality of Defendant's inadequate data security practices.

141. Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

142. Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

143. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

144. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

145. This claim is pleaded in the alternative to the breach of implied contract claim.

146. Plaintiff and Class members conferred a benefit upon Defendant. After all, Defendant benefitted from using their PII to provide employment and facilitate its business operations.

147. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class members. And Defendant benefited from receiving Plaintiff's and Class members' PII, as this was used to provide employment and facilitate its business operations.

148. Plaintiff and Class members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on

Defendant's duties under state and federal law and its internal policies.

149. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

150. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

151. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class members' employment because Defendant failed to adequately protect their PII.

152. Plaintiff and Class members have no adequate remedy at law.

153. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**SIXTH CAUSE OF ACTION**
**Violation of O.C.G.A. § 13-6-11**
**(On Behalf of Plaintiff and the Class)**

154. Plaintiff incorporates by reference Paragraphs 1 through 89 as if fully set forth herein.

155. Defendant through its actions alleged and described herein acted in bad faith, was stubbornly litigious, or caused Plaintiff and the Class unnecessary trouble and expense with respect to the events underlying this litigation.

156. Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce"

including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to implement and use reasonable measures to protect PII.

157. Defendant violated Section 5 of the FTC ACT by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII that it obtained and stored and the foreseeable consequences of a data breach.

158. Defendant also has a duty under the Georgia Constitution ("the Constitution") which contains a Right to Privacy Clause, Chapter 1, Article 1, to protect its users' private information. The Georgia Constitution states, "no person shall be deprived of life, liberty, or property except by due process of law." Moreover, the Georgia Constitution identifies certain invasions of privacy, including the Public Disclosure of Private Life which prohibits the public disclosure of private facts.

159. This duty has been recognized by the Georgia Supreme Court in the Restatement of the Law of Torts (Second) §652A which specifically recognized four common law invasion of privacy claims in Georgia, which include 1) appropriation of likeness; 2) intrusion on solitude or seclusion; 3) public disclosure of private facts; and 4) false light.

160. Defendant's implementation of inadequate data security measures, its failure to resolve vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect data it required Plaintiff and the Class to provide and store on its own servers constitutes a violation of the Georgia Constitution and the Restatement of the Law of Torts (Second).

161. Defendant knew or should have known that it had a responsibility to protect the PII it required Plaintiff and the Class to provide and stored, that it was entrusted with this PII, and that it was the only entity capable of adequately protecting the PII.

162. Despite that knowledge, Defendant abdicated its duty to protect the PII it required Plaintiff and the Class to provide and that it stored.

163. As a direct and proximate result of Defendant's actions, Plaintiff's and the Class Members' PII was stolen. As further alleged above, the Data Breach was a direct consequence of Defendant's abrogation of data security responsibility and its decision to employ knowingly deficient data security measures that knowingly left the PII unsecured. Had Defendant adopted reasonable data security measures, it could have prevented the Data Breach.

164. As further described above, Plaintiff and the Class have been injured and suffered losses directly attributable to the Data Breach.

165. Plaintiff and the Class therefore request that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

**PRAYER FOR RELIEF**

Plaintiff and Class members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further deceptive practices and making untrue

statements about the Data Breach and the stolen PII;

E. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11, or as otherwise permitted by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Date: November 08, 2024

Respectfully submitted,

*/s/ Joseph B. Alonso*
Joseph B. Alonso
Georgia Bar No. 013627
**ALONSO & WIRTH**
1708 Peachtree Street, NW
Suite 303
Atlanta, GA 30309
Tel: (678) 928-4472
jalonso@alonsowirth.com

Samuel J. Strauss*
Raina Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611

(872) 263-1100
(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

* *Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*

# Exhibit A

FPL food LLC

July 3, 2024

37 1 13457 ********************AUTO**5-DIGIT 30906
KENNETH LEWIS
[redacted]

Dear Kenneth Lewis,

We are writing to inform you of a data security incident that may have impacted some of your personal information. We take the security of your information and any concern this incident may cause very seriously. This letter contains information about actions we have taken to prevent a reoccurrence, and steps you can take to help protect your information.

**What Happened?**

Recently, we were the target of a ransomware attack. Ransomware is a computer virus that encrypts computer systems until and unless we pay money (i.e., the ransom) demanded by the attackers. We immediately notified law enforcement, moved quickly to contain the incident, and conducted a thorough investigation with the assistance of computer forensic experts. We believe it is likely the attacker only wanted money and not the information on our computers but, in an abundance of caution, we are letting you know that some of your personal information may have been accessed by the attackers.

**What Information was Involved?**

Our investigation revealed that some documents accessed may have contained information including your name, address, Social Security number, and employee benefits information.

**What Are We Doing?**

The security of all information in our systems is taken very seriously, and we want to assure you that there are already steps in place to prevent a reoccurrence, including implementing increased security measures and conducting additional employee training.

Additionally, we have secured the services of Kroll to provide identity monitoring at no cost to you for one year. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Web Watcher, Public Persona, Quick Cash Scan, $1 Million Identity Fraud Loss Reimbursement, Fraud Consultation, and Identity Theft Restoration.

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.

*You have until **October 3, 2024** to activate your identity monitoring services.*

Membership Number: [redacted]

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

Additional information describing your services is included with this letter.

# Exhibit B

RECEIVED
JUL 09 2024
DEPT. OF CONSUMER AFFAIRS

<<Date>> (Format: Month Day, Year)

<<first_name>> <<middle_name>> <<last_name>> <<suffix>>
<<address_1>>
<<address_2>>
<<city>>, <<state_province>> <<postal_code>>
<<country>>

**<<b2b_text_1 (Notice of Data Breach)>>**

Dear <<first_name>> <<last_name>>,

We are writing to inform you of a data security incident that may have impacted some of your personal information. We take the security of your information and any concern this incident may cause very seriously. This letter contains information about actions we have taken to prevent a reoccurrence, and steps you can take to help protect your information.

**What Happened?**

Recently, we were the target of a ransomware attack. Ransomware is a computer virus that encrypts computer systems until and unless we pay money (i.e., the ransom) demanded by the attackers. We immediately notified law enforcement, moved quickly to contain the incident, and conducted a thorough investigation with the assistance of computer forensic experts. We believe it is likely the attacker only wanted money and not the information on our computers but, in an abundance of caution, we are letting you know that some of your personal information may have been accessed by the attackers.

**What Information was Involved?**

Our investigation revealed that some documents accessed may have contained information including your name, address, Social Security number, and employee benefits information.

**What Are We Doing?**

The security of all information in our systems is taken very seriously, and we want to assure you that there are already steps in place to prevent a reoccurrence, including implementing increased security measures and conducting additional employee training.

Additionally, we have secured the services of Kroll to provide identity monitoring at no cost to you for one year. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Web Watcher, Public Persona, Quick Cash Scan, $1 Million Identity Fraud Loss Reimbursement, Fraud Consultation, and Identity Theft Restoration.

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.

*You have until <<b2b_text_6 (activation deadline)>> to activate your identity monitoring services.*

Membership Number: [redacted]

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

Additional information describing your services is included with this letter.

[redacted]

**What You Can Do.**

Although we have no reports of misuse of your or anyone's information, we encourage you to follow the instructions in this letter and activate the identity monitoring services we are providing at no cost to you. We also recommend that you review the "Additional Important Information" section included with this letter. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission (FTC) regarding identity theft protection and details on how to place a fraud alert or security freeze on your credit file. As an added precaution, you may want to closely monitor your personal accounts for any suspicious activity.

**For More Information.**

If you have any questions, please call 1-???-???-????, Monday through Friday from 9:00 am - 6:30 pm Eastern Time, excluding major U.S. holidays. We appreciate your patience and understanding, and we sincerely apologize for any inconvenience or concern this incident may cause you.

Sincerely,

[redacted]

Francois Leger
Chief Executive Officer

KROLL

## TAKE ADVANTAGE OF YOUR IDENTITY MONITORING SERVICES

You have been provided with access to the following services from Kroll:

**Single Bureau Credit Monitoring**

You will receive alerts when there are changes to your credit data—for instance, when a new line of credit is applied for in your name. If you do not recognize the activity, you'll have the option to call a Kroll fraud specialist, who will be able to help you determine if it is an indicator of identity theft.

**Web Watcher**

Web Watcher monitors internet sites where criminals may buy, sell, and trade personal identity information. An alert will be generated if evidence of your personal identity information is found.

**Public Persona**

Public Persona monitors and notifies when names, aliases, and addresses become associated with your Social Security number. If information is found, you will receive an alert.

**Quick Cash Scan**

Quick Cash Scan monitors short-term and cash-advance loan sources. You will receive an alert when a loan is reported, and you can call a Kroll fraud specialist for more information.

**$1 Million Identity Fraud Loss Reimbursement**

Reimburses you for out-of-pocket expenses totaling up to $1 million in covered legal costs and expenses for any one stolen identity event. All coverage is subject to the conditions and exclusions in the policy.

**Fraud Consultation**

You have unlimited access to consultation with a Kroll fraud specialist. Support includes showing you the most effective ways to protect your identity, explaining your rights and protections under the law, assistance with fraud alerts, and interpreting how personal information is accessed and used, including investigating suspicious activity that could be tied to an identity theft event.

**Identity Theft Restoration**

If you become a victim of identity theft, an experienced Kroll licensed investigator will work on your behalf to resolve related issues. You will have access to a dedicated investigator who understands your issues and can do most of the work for you. Your investigator will be able to dig deep to uncover the scope of the identity theft, and then work to resolve it.

Kroll's activation website is only compatible with the current version or one version earlier of Chrome, Firefox, Safari and Edge.

To receive credit services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.

***Additional Important Information***

**For residents of *Iowa*:** You are advised to report any suspected identity theft to law enforcement or to the Attorney General.

**For residents of *Oregon*:** You are advised to report any suspected identity theft to law enforcement, including the Attorney General, and the Federal Trade Commission.

**For residents of *New Mexico*:** You are advised to review personal account statements and credit reports, as applicable, to detect errors resulting from the security incident. You have rights under the federal Fair Credit Reporting Act (FCRA). These include, among others, the right to know what is in your file; to dispute incomplete or inaccurate information; and to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information. For more information about the FCRA, please visit https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf or see the contact information for the Federal Trade Commission listed below.

**For residents of *District of Columbia, Maryland, New York, North Carolina,* and *Rhode Island*:** You can obtain information from the District of Columbia, Maryland, North Carolina, New York, and Rhode Island Offices of the Attorney General and the Federal Trade Commission about fraud alerts, security freezes, and steps you can take toward preventing identity theft.

| DC Attorney General | Maryland Office of Attorney General | New York Attorney General | North Carolina Attorney General | Rhode Island Attorney General |
|---|---|---|---|---|
| 400 6th Street NW<br>Washington, DC<br>20001<br>1-202-727-3400<br>www.oag.dc.gov | 200 St. Paul Pl<br>Baltimore, MD<br>21202<br>1-888-743-0023<br>https://www.marylandattorneygeneral.gov/ | 120 Broadway, 3rd Fl<br>New York, NY<br>10271<br>1-800-771-7755<br>www.ag.ny.gov | 9001 Mail Service Ctr<br>Raleigh, NC<br>27699<br>1-877-566-7226<br>https://ncdoj.gov/ | 150 South Main St<br>Providence RI<br>02903<br>1-401-274-4400<br>www.riag.ri.gov |

**Federal Trade Commission,** Consumer Response Center
600 Pennsylvania Ave, NW Washington, DC 20580
1-877-IDTHEFT (438-4338) www.identitytheft.gov

***Massachusetts* and *Rhode Island* residents:** You have the right to obtain or file a police report.

**For residents of all states:** You may obtain a copy of your credit report, free of charge, whether or not you suspect any unauthorized activity on your account. You may obtain a free copy of your credit report from each of the three nationwide credit reporting agencies. To order your free credit report, please visit www.annualcreditreport.com, or call toll-free at 1-877-322-8228. You can also order your annual free credit report by mailing a completed Annual Credit Report Request Form (available at www.consumer.ftc.gov/articles/0155-free-credit-reports) to: Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281.

**Fraud Alerts:** You have the right to place fraud alerts with the three credit bureaus by phone and online with Equifax (https://assets.equifax.com/assets/personal/Fraud_Alert_Request_Form.pdf), Experian (www.experian.com/fraud/center.html) or Transunion (www.transunion.com/fraud-victim-resource/place-fraud-alert). A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts. For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit. Initial fraud alerts last for one year. Victims of identity theft can also get an extended fraud alert for seven years. The phone numbers for all three credit bureaus are at the bottom of this page.

**Monitoring:** You should always remain vigilant for incidents of fraud and identity theft by reviewing payment card account statements and monitoring your credit reports for suspicious or unusual activity and immediately report any suspicious activity or incidents of identity theft.

**Security Freeze:** You also have the right to place a security freeze on your credit report. A security freeze is intended to prevent credit, loans, and services from being approved in your name without your consent. To place a security freeze on your credit report, you need to make a request to each consumer reporting agency by visiting their websites below or by mail. In order to place the security freeze for yourself, your spouse, or a minor under the age of 16, you will need to provide your name, address for the past two years, date of birth, Social Security number, proof of identity and proof of address as requested by the credit reporting company. After receiving your freeze request, each credit reporting company will send you a confirmation letter containing a unique PIN (personal identification number) or password, which will be required to lift the freeze, which you can do either temporarily or permanently. It is free to place, lift, or remove a security freeze.

| Equifax Security Freeze | Experian Security Freeze | TransUnion Security Freeze |
|---|---|---|
| P.O. Box 105788<br>Atlanta, GA 30348-5788<br>www.equifax.com/personal/credit-report-services/credit-freeze/<br>1-866-478-0027 | P.O. Box 9554<br>Allen, TX 75013-9544<br>http://www.experian.com/freeze/center.html<br>1-888-397-3742 | P.O. Box 160<br>Woodlyn, PA 19094<br>www.transunion.com/credit-freeze<br>1-800-916-8800 |